## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ADVANCE HEAT PRODUCTS LTD., a Hong Kong corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 07 C 6784 |
| v. | ) ) | Judge George W. Lindberg |
| JAMES D. KOSKEY, JR., KOSKEY & HOWARD, INC. f/k/a K&H MANUFACTURING, INC., a Colorado corporation, and K&H MANUFACTURING, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) | Magistrate Judge Valdez |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, Advance Heat Products Ltd. ("Advance"), by its attorneys and for its first amended complaint against Defendants, Koskey & Howard, Inc. f/k/a K&H Manufacturing, Inc. ("K&H Corporation"), K&H Manufacturing, LLC ("K&H LLC") and James D. Koskey, Jr. ("Koskey"), states as follows:

### Parties

1. Advance is a corporation organized under the laws of Hong Kong and having its registered office at 19th Floor, Million Fortune Industrial Centre, 34-36 Chai Wan Kok Street, Tsuen Wan, New Territories, Hong Kong, and its principal place of business in the People's Republic of China.

2. K&H Corporation is a Colorado corporation with its principal place of business at 977 Ford Street, Colorado Springs, CO 80915. In May 2007, K&H Corporation changed its name from K&H Manufacturing, Inc. to Koskey & Howard, Inc.

3. In May 2007, K&H Corporation sold its real estate holdings to KTPS Real Estate Holdings, LLC ("KTPS").

4. Also in May 2007, K&H Corporation sold its remaining business assets to K&H LLC, which is a subsidiary of KTPS.

5. Koskey remained the President of K&H LLC. K&H LLC conducts business out of the same building as K&H Corporation, K&H LLC engages in the sale of the same pet products as did K&H Corporation, and the two companies use the same web address.

6. K&H LLC is the successor-in-interest to K&H Corporation.

7. K&H LLC is a Delaware limited liability company with its principal place of business in Colorado Springs, Colorado.

8. Koskey is an individual and a citizen of the State of Colorado.

9. Because the allegations in the First Amended Complaint began prior to May 2007 and are ongoing, the allegations implicate and include both K&H Corporation and K&H LLC. Additionally, K&H LLC is not only liable for its ongoing tortious activities as set forth in the First Amended Complaint, but also as successor-in-interest to K&H Corporation.

10. Hereinafter, K&H Corporation and K&H LLC will be collectively referred to as "K&H."

## Jurisdiction And Venue

11. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), because Plaintiff Advance is a citizen of a foreign state and Defendants K&H Corporation, K&H LLC, and Koskey are citizens of States, and the amount in controversy exceeds the value of $75,000, exclusive of interest and costs.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(3), because K&H Corporation and K&H LLC reside in this district for the purpose of determining venue pursuant to 28 U.S.C. § 1391(c), by virtue of their conducting business and having significant contacts in this district.  K&H Corporation and K&H LLC are therefore subject to personal jurisdiction in this district at the time this action was commenced.

13. This Court also has personal jurisdiction over Koskey as a result of his doing business in this district, including regular trips to this district to conduct the business of K&H.

## Facts Common To All Counts

14. Advance is a company that provides a full range of electrical heating products and parts, including temperature control thermostats, heating appliances, seat heaters, heated pads, heated pet beds and mats.  Advance also provides product assembly services.

15. Advance operates a manufacturing facility in Qingxi Township, Dongguan City, Dongguan, People's Republic of China.

16. From April 10, 1995 through March 31, 2001, Eric Kong Yau Ming ("Kong") had been employed by Advance Thermo Control, Ltd. ("ATC"), an affiliate of Advance.

17. Beginning in October 2000, through March 31, 2001, Kong was seconded from ATC to Advance to work as the acting factory manager of Advance's manufacturing facility.  During this time, Kong also continued to be employed by ATC, and ATC paid Kong's salary and other employment benefits for the services he did for Advance.

18. On April 1, 2001, Kong became an employee of Advance.  From April 1, 2001 through March 27, 2007, Kong worked for Advance as a factory manager of Advance's manufacturing facility.  Kong resigned from Advance on March 27, 2007.

19. For ease of administration, ATC would administer the payment of salaries and other employment benefits for all Advance employees, including Kong. ATC would then recoup from Advance the amount of the salaries and other employment benefits it paid to Advance employees. Thus, although Kong's salary and other employment benefits were still issued from ATC, from April 1, 2001 through the duration of Kong's employment with Advance, Advance ultimately paid Kong's salary and other employment benefits, through its reimbursement to ATC. Additionally, Kong was the legal representative of the Advance manufacturing facility, and Kong's business cards and e-mail address reflected his employment at Advance.

20. As factory manager of Advance's manufacturing facility, Kong was a member of the senior management team of Advance and had access to confidential information belonging to Advance.

21. While employed by ATC, Kong executed an employment contract with ATC, entitled Supplementary Employment Contract (the "Contract"). A true and correct copy of the Contract is attached as Exhibit A.

22. The Contract also governed Kong's employment with Advance.

23. The relevant portions of the Contract state as follows:

   a. The "employee," from the commencing date to the last date of employment, during or outside office hours, all rights of inventions, designs, & know-how which the "employee" develops in relation to the "employer's" field or scope of business belong forever exclusively to the "employer."

   b. In consideration for "employer" paying employee for developing trade secret, employee agrees not to work for other company producing product or service competing with "employer" during employment & within 12 months after future termination with Advance Thermo Control Ltd.

   c. "Employee" has duty to protect and to keep confidential "employer's" business confidential information & technical

4

> > information & rights, written or non-written, including inventions, designs, know-how, parts, products, process, customers, suppliers etc.
>
> d. "Employee" has the following duties:
>
> > a) to collect back all above-mentioned documents & samples relating to above from sub-contractors or potential buyers for sub-contract or quotation or marketing purposes.
> >
> > b) to return to "employer" all copies of above-mentioned documents in "employee's" possession on employment termination.

Exhibit A, § A (1)-(4).

24. The non-competition clause in the Contract is reasonable both in scope and duration.

25. By virtue of Kong's position as factory manager and legal representative of the Advance manufacturing facility, Kong owed to Advance the duty of fidelity, and that Kong would not use or disclose any of Advance's confidential information, such as the Trade Secrets (as defined in paragraph 35, below), upon termination of his employment with Advance.

26. During Kong's employment with Advance, K&H was a customer of Advance. Also during this time, Koskey was the president and a member of K&H.

27. Kong and Koskey became acquainted through K&H's customer relationship with Advance and Kong's employment with Advance.

28. In 2006, before Kong resigned from his position as a senior manager of Advance, Koskey and Kong developed a plan to jointly form a new company, so that K&H could purchase products from the new company, rather than Advance. Kong and Koskey agreed that this new company would develop new products for K&H, as well as produce products for K&H that K&H had previously contracted to buy from Advance.

29. On January 15, 2007, months before Kong resigned from Advance, Kong and Koskey incorporated in Hong Kong a new company, Sinoethics-United Limited ("Sinoethics").

30. Kong and Koskey are the founders and co-owners of Sinoethics, the sole capital contributors to Sinoethics, and the sole shareholders of Sinoethics. Koskey holds 5,000 shares and Kong holds 4,999 shares.

31. Sinoethics is and has been using a manufacturing facility in China, also named "Sinoethics-United Limited" (the "Sinoethics Manufacturing Facility"). Like the Advance manufacturing facility, the Sinoethics Manufacturing Facility is also located in Qingxi Township, Dongguan City, Dongguan, People's Republic of China.

32. Kong and Koskey paid for the preparation work on the factory and both have their own quarters in the factory, and Kong signed the lease for the Sinoethics Manufacturing Facility.

33. Sinoethics competes directly with Advance. Sinoethics manufactures the same types of products as Advance and has manufactured products for long-standing customers of Advance, including K&H.

34. In breach of the non-competition clause of the Contract, Kong holds the executive position of General Manager at the Sinoethics Manufacturing Facility.

35. While Kong was still employed at Advance, and thereafter, he misappropriated secret and confidential information and data from Advance for use by Kong and Sinoethics and its affiliates, subsidiaries and related companies ("Sino"), including but not limited to, customer lists, pricing information, proprietary technology, proprietary accounting technology, and costs and other financial information (collectively, the "Trade Secrets").

36. Kong misappropriated the Trade Secrets with the knowledge of Koskey and K&H.

37. Included in the Trade Secrets misappropriated by Kong is the proprietary technology for an adjustable-digital-temperature-control-heated dog bed which is currently marketed and sold by K&H under the name "Deluxe Lectro-Kennel" (the "DLK").

38. Through Koskey, K&H initially pursued the development of the DLK with Advance. In July 2006, Advance provided K&H with price quotations for the DLK. Advance also provided K&H with samples of the DLK, incorporating the electrical and electronic components of the DLK.

39. Shortly thereafter, Advance was informed that K&H thought that the price of the DLK was too high and that K&H therefore no longer wished to purchase the DLK from Advance.

40. Instead, without the knowledge or consent of any Advance management other than his confederate Kong, Koskey requested that Kong personally continue to develop the DLK for K&H, even though Kong was still employed at Advance. On information and belief, Koskey made this request, knowing that Kong would be using Advance's resources to continue to develop the DLK for K&H.

41. The Advance resources relied upon by Kong to develop and produce the DLK for K&H include, but are not limited to, the following:

    a. Jack Chen ("Chen"), engineering supervisor with Advance at all relevant times, created the engineering drawings of the base and cover pad of the DLK, in the course of his employment with Advance and at the Advance manufacturing facility.

    b. Chow Kwok Wai ("Chow"), head engineer with ATC at all relevant times, in conjunction with his team of engineers, created the "Schematic Circuit Diagram" for the DLK, in the course of his employment with ATC and at the ATC manufacturing facility.

  c. Prototypes and samples of the DLK were created by employees of Advance in the course of their employment with Advance and at the Advance manufacturing facility.

  d. 3-Dimensional renderings of the DLK were created by employees of Advance in the course of their employment with Advance and at the Advance manufacturing facility.

  e. Thor Zhang ("Zhang"), an engineer with Advance at all relevant times, created drawings of display boxes for the DLK, in the course of his employment with Advance and at the Advance manufacturing facility.

  f. The bill of materials for the DLK was created by employees of Advance in the course of their employment with Advance and at the Advance manufacturing facility.

42. In or around December 2006, months before his departure from Advance, Kong used Advance's Trade Secrets to produce the molds, software and tooling necessary for the production of the DLK, but used it to enable Sino, rather than Advance, to produce, sell, and supply the DLK to K&H.

43. Kong, through Sino, while still bound by the terms of the Contract, sold the DLK to K&H without the knowledge or consent of Advance. Proceeds from the sale to K&H of the DLK were not paid to Advance, but instead were paid to Kong and Sino.

44. K&H continues to sell the DLK today and it is advertised on their website. On information and belief, the DLK continues to be manufactured at the Sinoethics Manufacturing Facility, and K&H continues to purchase the DLK from Sino.

45. In 2006, while Kong was still employed at Advance, Kong, on behalf of Sino, and at the behest of Koskey, misappropriated the tooling and molds for a heated plant pot (the "Plant Heater"). Koskey and K&H brought the buyer of the Plant Heater to Kong and Sino, and acted as broker through the manufacturing and sales process of the Plant Heater. Kong and Sino then

sold the Plant Heater without the knowledge or consent of Advance, and without turning the sales proceeds over to Advance.

46. In 2006 and 2007, while Kong was still employed by Advance, Kong developed the proprietary technology and components for, and misappropriated the tooling and molds for, a stainless steel dog bowl heater (the "Dog Bowl Heater"), at the direction of Koskey and K&H and on behalf of Sino. The Dog Bowl Heater was developed, manufactured, and sold without the knowledge or consent of Advance, at the Advance facility and using Advance resources. Proceeds from the sale of the Dog Bowl Heater to K&H were directed to Kong and Sino, rather than Advance.

47. Without the consent of Advance, Kong and Sino also used tooling and molds owned by Advance to make parts to fill orders placed by K&H with Sino.

48. Kong's incorporation and operation of Sino as a competitor of Advance, and Kong's use of the Trade Secrets in the operation of Sino, are in violation of the Contract.

## COUNT I
### Violation of the Illinois Trade Secrets Act

49. Plaintiff re-alleges paragraphs 1-48 as paragraph 49 of its Count I.

50. The Trade Secrets used in the manufacture of, among other products, the DLK, the Plant Heater and the Heated Dog Bowl, are trade secrets under section 2 of the Illinois Trade Secrets Act (the "Act").

51. Advance's customer lists, pricing information, proprietary accounting technology, and costs and other financial information are also trade secrets under section 2 of the Act.

52. Kong's misappropriation and use of the Trade Secrets to manufacture, among other products, the DLK, the Plant Heater and the Heated Dog Bowl, is a violation under section 2 of the Act.

9

53. Kong's use of the Trade Secrets, including the customer lists, pricing information, proprietary accounting technology, and costs and other financial information for the his own benefit and the benefit of Sino is also a violation under section 2 of the Act.

54. Through sales of the DLK, the Plant Heater and the Heated Dog Bowl, among other things, Koskey is using the Trade Secrets to benefit K&H and by doing so, Koskey and K&H are using the Trade Secrets in K&H's business in violation of the Act.

55. Koskey knew or had reason to know that he and K&H were using the misappropriated Trade Secrets in K&H's business.

56. Koskey and K&H have willfully and maliciously misappropriated the Trade Secrets for their own gain.

57. Advance has been damaged by Koskey and K&H's misappropriation of its Trade Secrets in an amount in excess of $75,000.00.

WHEREFORE, Advance asks this Court to enter judgment in favor of Advance and against all Defendants:

a) Enjoining Defendants pursuant to section 3 of the Act, ordering Koskey and K&H to immediately cease their use of any and all Trade Secrets, including but not limited to those Trade Secrets used in the manufacture of the DLK, the Plant Heater and the Heated Dog Bowl;

b) Requiring Defendants to return, delete and/or destroy any Trade Secrets that are in the possession of Koskey or K&H, including but not limited to the Trade Secrets used in the manufacture of the DLK, the Plant Heater and the Heated Dog Bowl;

c) Ordering Koskey and K&H to cease purchasing any product from Sino manufactured using any of the Trade Secrets, including but not limited to the Trade Secrets used in the manufacture of the DLK, the Plant Heater and the Heated Dog Bowl;

d) Awarding Advance actual damages pursuant to section 4(a) of the Act, in an amount to be determined at trial commensurate with the actual loss to Advance and the unjust enrichment to the Defendants caused by the misappropriation;

e) Awarding Advance exemplary damages pursuant to section 4(b) of the Act in the amount of twice the actual damages awarded under section 4(a) of the Act;

f) Awarding Advance its attorneys' fees pursuant to section 5 of the Act; and

g) Awarding Advance its costs and any further relief that this Court deems appropriate and just.

## COUNT II
### Tortious Interference With Contract

58. Plaintiff re-alleges paragraphs 1-57 as paragraph 58 of its Count II.

59. On information and belief, as early as 2006, Koskey and K&H knew or should have known that Kong was then employed by Advance and knew of the Contract and its terms.

60. On information and belief, in 2006 and thereafter, Koskey and K&H knew or should have known that, as an employee of Advance, Kong independently owed Advance a duty of loyalty and confidentiality.

61. Specifically, Koskey and K&H knew or should have known that Kong was prohibited from using assets of Advance for the benefit of Sino.

62. Additionally, Koskey and K&H knew or should have known that the creation of Sino while Kong was still employed with Advance was in breach of the Contract and in breach of Kong's duty of loyalty and confidentiality.

63. By ordering products directly from Kong in 2006, Koskey and K&H intentionally interfered with the Contract and unjustifiably induced Kong to breach the Contract and to breach his duty of loyalty and confidentiality.

64. Kong breached the Contract and his duties when he, for his own personal benefit, supplied Koskey and K&H with products manufactured using the Trade Secrets, including but not limited to the DLK and the Heated Dog Bowl, in contravention of the requirement under the Contract that "all rights of inventions, designs, & know-how which the "employee" develops in relation to [Advance's] field or scope of business belong forever exclusively to [Advance]." *See* Exhibit A, § A(1).

65. The Contract's non-compete provision prohibits Kong from working for any "other company producing product or service competing with [Advance] during employment & within 12 months after future termination with [Advance]." Exhibit A, § A(2).

66. By working with Kong to establish Sino to directly compete with Advance while Kong was still employed with Advance, Koskey intentionally interfered with the Contract and unjustifiably induced Kong to breach the Contract.

67. By continuing to operate Sino with Kong, Koskey continues to intentionally interfere with the Contract and unjustifiably induce Kong's continued and ongoing breach of the Contract.

68. Advance has been damaged by Kong's past and ongoing breaches of the Contract in an amount in excess of $75,000.00.

WHEREFORE, Advance respectfully requests this Court enter judgment in its favor and against Defendants damages in amount to be determined at trial and award Advance its cost of this litigation. Plaintiff additionally requests costs and any further relief that this Court deems appropriate and just.

## COUNT III
### Civil Conspiracy

69. Plaintiff re-alleges paragraphs 1-68 as paragraph 69 of its Count III.

70. Kong and Koskey agreed to form Sino.

71. Sino operates by unlawful means, namely the theft of the Advance's Trade Secrets and Kong's breach of the Contract.

72. Sino continues to improperly and illegally utilize the Trade Secrets for its own financial gain.

73. In order to operate Sino, Kong stole Trade Secrets and breached the Contract.

74. Kong and Koskey have used Advance's Trade Secrets to conduct the business of Sino.

75. Koskey and K&H knew that Sino was using the misappropriated Trade Secrets, and, in fact, on information and belief, encouraged Kong to misappropriate the Trade Secrets for Sino, Koskey and K&H's benefit.

76. Because Koskey is involved in the continued operation of Sino, he is liable as a civil conspirator for the damages resulting for the misappropriation of the Trade Secrets as well as the damages resulting from Kong's breach of the Contract.

77. Additionally, K&H is liable as a civil conspirator because K&H, through Koskey, conspired with Kong to misappropriate proceeds from the sale of Advance products which should have gone to Advance.

78. K&H, among other things, knowingly abandoned pursuit of the DLK with Advance, and instead convinced Kong to produce the DLK with Advance's resources, so that K&H could get a better price as a result of Kong and Koskey's forming Sino.

79. K&H also began purchasing additional products from and pursuing additional projects through Sino which it had previously purchased from Advance, knowing that Sino was utilizing materials and Trade Secrets which had been misappropriated by Kong and Koskey from

Advance. The products and projects include, but are not limited to, the Plant Heater and the Heated Dog Bowl.

WHEREFORE, Advance respectfully requests this Court enter judgment in its favor and against Defendants damages in amount to be determined at trial and award Advance its cost of this litigation. Plaintiff additionally requests costs and any further relief that this Court deems appropriate and just.

### Jury Demand

Plaintiff hereby demands a trial by jury on all counts.

>
> Respectfully submitted,
>
> ADVANCE HEAT PRODUCTS LTD.
>
> By:     /s/ Donald R. Cassling
>              One of Its Attorneys

Donald R. Cassling
dcassling@quarles.com
Charles E. Harper, Jr.
charper@quarles.com
Jacquelyn T. Pinnell
jpinnell@quarles.com
QUARLES & BRADY LLP
500 West Madison Street, Suite 3700
Chicago, Illinois 60661
(312) 715-5000
(312) 715-5155 (fax)

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on January 25, 2008, a copy of the foregoing **First Amended Complaint** was filed electronically using the Court's CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system at the email addresses indicated below. Parties may access this filing through the Court's system.

> John David Burke
> ICE MILLER LLP
> 200 West Madison Street
> Suite 3500
> Chicago, IL 60606
> (312) 726-8148
> john.burke@icemiller.com

>         /s/ Donald R. Cassling
> *One of the attorneys for Advance Heat Products Ltd.*

QBACTIVE\6057164.5